CARL M. HANSEN, Administrator of estate of HENRY C. CHRISTENSEN, Appellee, v. ERNEST NELSON, Appellee, and ELMER STALZER, Appellant.

No. 47489.

(Reported in 39 N.W. 2d 292)

OCTOBER 18, 1949.

Jno. A. Senneff, of Mason City, for appellant.

Uhlenhopp & Uhlenhopp, of Hampton, for Carl M. Hansen, appellee, administrator.

Leming & Hobson, of Hampton, for Ernest Nelson, appellee.

SMITH, J.—On February 6, 1947, plaintiff's intestate, Henry C. Christensen, immediately after or during a violent snow-and-wind storm, was riding easterly in a car driven by defendant Stalzer. In or at the westerly end of a deep cut in a snowdrift the car collided with a Ford pickup truck coming from the east and driven by defendant Nelson, causing personal injury to Christensen from which he subsequently died.

Defendant Stalzer and decedent, Christensen, were employees of the Armand Company farm, known as the Wilshire farm, in Franklin County. It was operated by Carl M. Hansen who, as administrator of decedent's estate, is plaintiff herein.

Each employee had his own car (Stalzer's actually belonged to his sister), used on occasion for farm business, such use being paid for by gasoline from the farm supply.

On the day in question many of the roads were blocked by a blizzard that had raged for some days (since January 29, according to plaintiff). On the morning of February 6, plaintiff requested Stalzer to use his (sister's) car to take the block of Christensen's car to Belmond for repairs; so it, being a Model A Ford and more suitable for use under existing conditions, could be made available for farm purposes. He also suggested picking up mail at Alexander as the pay roll was in it. There was also some farm shopping to be done. Plaintiff sent decedent along to help shovel snow if they "ran into difficulty."

Action by plaintiff-administrator against both drivers resulted in verdict and judgment for plaintiff against defendant Stalzer from which the latter appeals, and in favor of Nelson, from which plaintiff appeals.

Defendant Stalzer assigns seven errors: 1. Decedent was a guest, and verdict should have been directed against plaintiff on that theory. 2. Stalzer's amendment to answer, pleading assumption of risk at close of evidence, should have been permitted. 3. The court should have sustained this defendant's

objections to evidence in two instances. 4. Requested instruction as to emergency confronting him should have been given. 5. Requested instruction on accident without negligence should have been given. 6. Requested instruction on assumption of risk should have been given (see No. 2, above). 7. Requested instruction on unavoidable accident should have been given.

 I. We cannot agree with defendant Stalzer's contention that the record, as a matter of law, shows decedent was his guest on the fateful trip. Plaintiff argues the court should have decided, as a matter of law, that the guest relationship did *not* exist, but we need not go that far either. The court submitted the question to the jury by general instruction and special interrogatories. In so doing there was no error of which defendant Stalzer can complain.

Hansen, operator of the farm where both Stalzer and decedent (Christensen) worked, testified that on occasion both the Christensen and Stalzer cars had been used for farm purposes. Whether this use of their cars was a part of their contract of employment seems unimportant. Certainly the making of trips to town for farm purposes was a part of their employment. The question of Stalzer's liability for Christensen's death does not depend on the ownership of the car he was driving but on his conduct as a driver and Christensen's status, as a passenger, whether guest or otherwise.

Undoubtedly there was evidence the trip was made at Hansen's direction, primarily for farm purposes. He testifies:

"I stated to Elmer [Stalzer] my car was laid up and that I had no transportation on the farm and that my car being one of the modern cars and no actual travel of the roads, they were not open * * * better think about getting Henry's [Christensen's] car in shape so I will have some transportation. * * * Because it was a Model A Ford, high wheel, get through the snow where a modern car wouldn't get through. * * * I told Stalzer I was going to have he and Henry dismantle Henry's car so they could get the block to Belmond for repairs."

That was February 3. The blizzard had been going on for nearly a week. Hansen says the two employees then spent a

day and a half opening the road (approximately one mile eastward to the north and south road down to Latimer). The farm was about four miles north and one mile west of Latimer, and approximately four miles east and two miles north of Alexander. "On the 5th * * * I arranged with Elmer [Stalzer] for this trip * * *. I said if the weather is clear in the morning and you think you can get through you go with your car * * * and go to Belmond [approximately twelve miles west of the farm] and take this motor block of Henry's in and also stop in Alexander [approximately four miles west of the farm] and get the farm mail because the farm pay roll was in it. * * * Then I asked him to get some strainer pads for the farm, some supplies the farm needed. * * * I told him I would send Henry [decedent] along and some scoops so if they ran into difficulty could have some way of being shoveled out. Henry would shovel him out."

Stalzer testifies (as plaintiff's witness):

"I recall taking the block out of Henry's car there at the farm and of Mr. Hansen telling me to take the block into town. * * * I recall we said something about picking the mail up but there was nothing definite said about it, because none of us at the time knew whether that highway had been opened up to Alexander."

As a matter of fact the morning of the trip the men (according to Stalzer's testimony) went, not west toward Alexander and Belmond but east to Chapin (about eight miles from the farm) then south on Highway 65 five or six miles to Hampton, thence back west on No. 3, past Latimer, to the junction of No. 3 with No. 107, which latter road runs north from No. 3, about four miles to Alexander. Stalzer says "the weather was quiet and clear at that time." They picked up the mail at Alexander, went back south on No. 107 to No. 3, thence west to the junction of No. 3 with No. 69, thence north six or seven miles to Belmond.

At Belmond, Stalzer got some gas while decedent "put in his grocery order" and they took the block over to the garage. Stalzer picked up the "strainer discs" and they went back over

the route they came—south on No. 69, thence east on No. 3. The collision occurred on No. 3, somewhat west (about eighty rods) of its junction with No. 107.

It is argued on behalf of Stalzer that the main reason for going on to Belmond, after picking up the mail at Alexander, was to get decedent's car fixed and that no possible tangible benefit to Stalzer was involved. This much may be admitted without establishing decedent's guest status as a matter of law.

As to the benefit to Stalzer it is to be noted he made the trip, not primarily for direct benefit to himself, but upon direction of Hansen and in the performance of the duties of his employment. The same was true as to decedent. The benefit to him (because it was his car that was to be fixed at Belmond) was incidental. Hansen was having it done "because it was a Model A Ford, high wheel, get through the snow where a modern car wouldn't get through." He told Stalzer "better think about getting Henry's car in shape so I will have some transportation."

Decedent went along, not because his car was the one to be fixed, but on Hansen's orders to shovel snow if necessary to get through. The jury could reasonably find, as it in fact did find, that both men were in the performance of service for their employer. Neither one invited the other.

Under these facts, in order to negative guest relationship, it was not necessary that Stalzer derive any special benefit. The opinion in Clendenning v. Simerman, 220 Iowa 739, 743–746, 263 N.W. 248, cited in his behalf, quotes at length from Knutson v. Lurie, 217 Iowa 192, 195, 251 N.W. 147, 149, as furnishing "the criterion for determining whether a passenger is a non-gratuitous one, who may recover upon the showing of mere negligence," that is, not a guest. The enumeration was sufficient in each of those cases to include plaintiff as such a "non-guest" passenger.

But it does not of necessity follow that the enumeration was complete, and exclusive of every other possible relationship that might be in that class. These cases list three situations that do not come under the guest statute, viz., where the passenger is riding: 1. For the purpose of performing his duty as servant of the owner or operator of the car. 2. For the bene-

fit of the owner or operator, or 3. For the mutual benefit of owner or operator and the passenger.

But how do these differ in principle from the situation which the jury could find here? The passenger and driver were both performing a duty for their common employer, each within the terms of his employment. Decedent was not technically performing a duty to the owner or operator of the car in which he rode but he was serving an employer for whose benefit the car was being operated—the virtual owner of the car for the time being. Had it really been a car of the Armand Company that was being used the case would fall squarely within the first and second situations above enumerated.

We think there was ample evidence to support the jury's finding that decedent was not a guest.

Other cases cited are not helpful to defendant Stalzer's contention. In fact we find no cited case more nearly in point than the Clendenning and Knutson cases above discussed.

II. An amendment to answer "to conform to the proof" was offered by defendant Stalzer at the close of the evidence. It pleaded assumption of risk by decedent because, riding in the same seat with Stalzer, facing in the same direction, with the same opportunities of seeing and appreciating the hazards of going forward, he acquiesced in the trip and in the manner in which Stalzer was driving.

Plaintiff objected on the ground the amendment came too late, would substantially change the issues and was unsupported by any evidence.

The trial court disallowed the amendment, because the evidence did not warrant submitting instruction thereon to the jury.

The term "assumption of risk" probably originated in the law of Master and Servant and connoted a "consequence of contract," usually implied. The cases are too numerous to permit of citations or analysis. See 4 Words and Phrases, Perm. Ed., 607 et seq.; 7 C. J. S., Assumption of risk, 137, note 14; 35 Am. Jur., Master and Servant, sections 293, 294; Edwards v. Kirk, 227 Iowa 684, 288 N.W. 875.

The cases involving the employer-employee relationship are illustrated by Martin v. Des Moines Edison Light Co., 131 Iowa 724, 106 N.W. 359, and Vohs v. Shorthill & Co., 130 Iowa 538, 107 N.W. 417. Even in such cases the term is said to have two meanings or applications, one referring to assumption of the risks naturally incident to the employment, the other to assumption of those arising from the employer's negligence after the employee knows or in the exercise of reasonable care should know the danger. In the second sense the defense must be pleaded. Vohs v. Shorthill & Co., supra, 130 Iowa, at page 544.

Our court, after enactment of our "guest" statute (section 321.494, Code of 1946), held that in cases under it the doctrine of contributory negligence was inapplicable. Siesseger v. Puth, 213 Iowa 164, 182, 239 N.W. 46. Since the defendant was not answerable for mere negligence, it was held contributory negligence was not an element to be considered.

In a later case the inevitable question arose as to the doctrine of assumption of risk in "guest cases." White v. McVicker, 216 Iowa 90, 246 N.W. 385. It was there held applicable in such cases though the record in that case did not warrant submission of that issue to the jury.

We had occasion later to discuss the doctrine in a case in which the administrator of a guest in one of the colliding vehicles brought action against the driver of the other. Edwards v. Kirk, supra, 227 Iowa 684. In that case plaintiff's intestate was a guest on a motorcycle and defendant did not contend he assumed the risk of defendant's negligence, but claimed he assumed the risk of the negligent operation of the motorcycle. Manifestly that case was not a "guest" case, as the term is generally used, and such as was involved in White v. McVicker, supra.

The Edwards v. Kirk opinion seems to concede that an issue of assumption of risk, or at least of "volenti non fit injuria" (he who consents cannot receive an injury) might exist in a negligence case without any contractual or guest relationship, but that the pleading in that particular case did not present that issue because the situation or condition producing the risk did not exist for such a length of time that the plaintiff's intestate had any opportunity to "assume" or refuse to assume the

risk. However, the concluding words of the opinion, hereinafter quoted, casts doubt on any assumption that the writer so intended.

The case of Miller v. Mathis, 233 Iowa 221, 226, 8 N.W. 2d 744, 747, is more nearly in point here. It involved an action in which plaintiff suffered injury while a passenger but not a guest of defendant, they being coadventurers. We reversed the case because the court submitted the issue of assumption of risk. The opinion reviews the case of White v. McVicker, supra, and points out it arose under the guest statute. The opinion also discusses the opinion in Edwards v. Kirk, supra, and quotes its concluding words: " 'We are unwilling to introduce into the law pertaining to the many cases based on negligence, growing out of automobile collisions, the doctrine [assumption of risk] contended for by appellant.' "

The Miller v. Mathis opinion points out that in negligence cases, under our practice, the burden is on plaintiff to plead and prove freedom from contributory negligence; and that to inject into them the issue of assumption of risk, an affirmative defense which defendant must plead and prove, would create confusion which could be avoided by instructing upon contributory negligence so as to include any issue of acquiescence in a known position of danger, citing Dreier v. McDermott, 157 Iowa 726, 736, 737, 141 N.W. 315, 319, 50 L. R. A. N. S., 566, and other cases which support such a conception of contributory negligence.

The Minnesota court has stated the same proposition thus:

"In the ordinary personal injury action, where plaintiff puts himself in a position to encounter known hazards which the ordinarily prudent person would not do, he assumes the risk of injury therefrom. Such assumption of risk is but a phase of contributory negligence and is properly included within the scope of that term." (Citing authorities.) Hubenette v. Ostby, 213 Minn. 349, 350, 6 N.W. 2d 637, 638.

See also Johnson v. Evanski, 221 Minn. 323, 22 N.W. 2d 213.

In Wisconsin it is held the "doctrine of assumption of risk in automobile collision cases does not apply except in cases of

guest against host." Schubring v. Weggen, 234 Wis. 517, 520, 291 N.W. 788, 790.

In Kentucky the same result is reached:

"The doctrine of 'assumption of risk' historically arose under the general law of master and servant, and has for the most part been deemed a matter of contract. In negligence cases the same concept has been generally accepted as contributory negligence. In their legal effect, the two doctrines are identical. They deny the right of recovery where the injured person with knowledge of a dangerous situation voluntarily places himself in a position where he takes the chance of being hurt." Porter v. Cornett, 306 Ky. 25, 29, 206 S.W. 2d 83, 85.

To be consistent, since the trial court submitted to the jury the question of the existence of guest relationship, there should have been an instruction on the doctrine of assumption of risk, to be followed if guest relationship was by the jury found to exist. However, the jury's special finding that the decedent was not a guest, removed the possibility of prejudicial error in the court's rulings.

III. Error is assigned on two rulings on evidence. One permitting witness Hansen to testify that he had sent the Stalzer car on a previous trip when Stalzer's brother Cletus was the employee-driver; the other, in permitting a witness (Wirtz) who examined the Stalzer car after the collision, to testify "it was struck from the right side."

■ There was no reversible error in either ruling. Previous use of the Stalzer car, when Cletus, and before defendant, was the employee, may not have been very material and the testimony may have been in the nature of hearsay but it could not have prejudiced defendant who was concededly driving the car on an errand for his employer on the occasion involved here.

■ The statement of the witness Wirtz was merely descriptive of the car's appearance. It was perhaps in form a conclusion but the jury could not have been misled. No pretense was made that the witness saw the collision or was testifying to anything but the appearance of the car. He continued the description stating the condition of the car which showed upon what he based the statement complained of.

1308

IV. Assignments 4, 5 and 7, as to accident without negligence, emergency and unavoidable accident, were sufficiently covered by the instructions given. The jury was plainly told that no recovery could be had except upon a finding the collision was proximately caused by the negligence of defendant; and "that a person confronted by an emergency not of his own making is not held to the same strict rule of observance of the motor vehicle laws of the road as one who is given time and opportunity to consider the matter but is required under such circumstances to act as a careful and prudent person would act under like and similar circumstances."

This gave defendant all he was entitled to and was fair to all parties.

V. On plaintiff's appeal from the judgment against him and in favor of defendant Nelson, various errors are assigned. They require statement of some further details of the collision. It occurred on Highway No. 3 about eighty rods west of the intersection of that highway with No. 107. Stalzer and decedent were proceeding eastward on their return trip, defendant Nelson was coming from the east through the cut in or just west of which the cars collided.

It fairly appears this cut was opened through the snowdrift the full width of the pavement for two-lane traffic and was variously estimated by the witnesses as being from fifty to one hundred feet long east and west. The variances in estimate were probably in part due to the varying depth of the cut, the smaller figure referring to the "deepest part."

Stalzer and decedent went through it from east to west going, and were approaching it from the west on their return trip. Defendant Nelson had gone east through it earlier. The cut on its north side was about as deep as the height of a car but not so deep on its south.

The testimony fairly indicates that the degree of visibility during the day varied from time to time and from place to place. Both defendants Stalzer and Nelson were called by plaintiff as witnesses. Stalzer says: "The snow was starting to blow but the visibility was good up until the accident. * * * I met a car, a snow plow and three or more cars * * *. The highway was good west of the cut. It was clear as I approached."

Nelson testifies that as he and his companions who had been hauling hogs started west from the Alexander corner the visibility was worse than when they came through earlier: "The visibility was bad in that cut." He says that before they reached the cut "the visibility was fair * * *. I think we could have seen a car eighty rods, forty rods." After they entered the cut he estimates it not over thirty feet.

Each defendant testifies the other was to blame. We are not concerned with that problem as the assignments do not require such concern. Nelson says he first saw the Stalzer car when he (Nelson) was "about in the middle of the cut. I would say the cut was about fifty to seventy-five feet long." He says as he entered the cut he was going about fifteen miles an hour and he did not increase his speed as he proceeded.

Stalzer testifies he saw the Nelson pickup when it was about thirty feet away and that he (Stalzer) was "driving about thirty miles an hour. I couldn't really say whether I was going that fast at the time of the accident * * *. As far as I know I did not decrease my speed any."

VI. Plaintiff first assigns as error the failure of the court to submit to the jury the "assured clear distance" specification and the specification that defendant Nelson continued to drive ahead when visibility was obscured.

It must be conceded we have held in several cases that the giving of an instruction on "assured clear distance" was not error when there was involved a collision between cars approaching each other. Sergeant v. Challis, 213 Iowa 57, 64, 65, 238 N.W. 442; Albert v. Maher Brothers Transfer Co., 215 Iowa 197, 208, 243 N.W. 561; Hoegh v. See, 215 Iowa 733, 738, 739, 246 N.W. 787. In none of the cases however is discussed the sufficiency under the record of an instruction that embodies the substantial language of the statute preceding the reference to the "assured clear distance ahead" provision.

Section 321.285, Code of 1946 (I. C. A.), provides:

"Any person driving a motor vehicle on a highway shall drive the same at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other

conditions then existing, and no person shall drive any vehicle upon a highway at a speed greater than will permit him to bring it to a stop within the assured clear distance ahead, such driver having the right to assume, however, that all persons using said highway will observe the law."

Following this are definite speed limitations in certain zones, not necessary to set out here.

Plaintiff pleaded three specifications under this statute: one alleging "dangerous, excessive, and illegal rate of speed"; another alleging "a speed that was careless, imprudent, unreasonable, and improper, having due regard to the traffic, surface and width of the highway, and said poor visibility and snowdrifts"; and a third based on the "assured clear distance ahead" provision.

The trial court, in stating the issues, mentioned only the second one, quoting it verbatim, and told the jury that the law of the state requires motorists to "drive at a careful and prudent speed, not greater than is reasonable and proper, having due regard to the traffic, surface and width of the highway and any other conditions then existing."

There then followed the instruction that if the jury found either defendant drove at a speed "that was not careful or prudent, or greater than was reasonable or proper in view of the traffic, width and surface of the highway and of any other conditions then and there existing, in so far as shown by the evidence" such defendant would be negligent.

It is true no mention was made in express terms to "the assured clear distance ahead." But we think the instruction given was sufficient under the record. To have given more or to have referred expressly to the question of visibility might have been to emphasize unduly the question of visibility in relation to speed. The reference to "any other conditions then and there existing, in so far as shown by the evidence" was sufficient.

What we have said here practically disposes of another assignment based on failure to submit a specification that defendant was negligent in driving ahead "when visibility was obscured and other cars might be expected."

VII. Other assignments concerning alleged failure to give audible warning—complaining of the court's failure to submit plaintiff's version of the situation as one involving peculiar danger and complaining of the instruction on contributory negligence as too abstract in form—are without merit. There is no evidence that audible warning was not given nor does it appear such warning was required under the conditions shown.

Nor do we find any reversible error in the alleged failure to submit plaintiff's theory of the case, at least in absence of a request for greater elaboration. The instructions fairly presented the issues in so far as the evidence justified.

The instruction on contributory negligence is not open to the attack made on it. The verdict against Stalzer, the other defendant, is conclusive proof that the jury found plaintiff's intestate free from contributory negligence and that the verdict in favor of defendant Nelson does not rest on a finding of contributory negligence.

We have examined the record with care as bearing on both appeals. The trial court handled a difficult situation well. There is nothing presented on either appeal requiring reversal. It follows the case must be affirmed.—Affirmed on both appeals.

HAYS, C. J., and HALE, OLIVER, GARFIELD, WENNERSTRUM, MANTZ, and MULRONEY, JJ., concur.

BLISS, J., takes no part.