551 So.2d 1251 (1989)
CUSHMAN & WAKEFIELD OF FLORIDA, INC., Appellant,
v.
Marnie Ruth WILLIAMS (F/K/a Marnie Ruth Troutman), Louis A. Dombrova, Appellees.
No. 89-00646.
District Court of Appeal of Florida, Second District.
November 8, 1989.
William E. Sizemore and Ronald W. Fraley of Thompson, Sizemore & Gonzalez, P.A., Tampa, for appellant.
Richard J. McKay of Hill, Ward & Henderson, P.A., Tampa, for appellees.
PARKER, Judge.
Cushman & Wakefield of Florida, Inc., who was the defendant in the trial court, appeals a final judgment entered against it, which awarded commissions to Marnie Ruth Williams and Louis A. Dombrova. We reverse.
Appellees Williams and Dombrova filed a complaint against Cushman & Wakefield for damages in connection with unpaid commissions. Both are former employees of Cushman & Wakefield and were employed as real estate brokers/salespersons. Both signed employment contracts with Cushman & Wakefield. The employment contract, among setting forth other terms and conditions of employment, established the circumstances under which salespersons were entitled to commissions and fees on transactions in which they rendered services. Paragraph nine of the employment contract set forth conditions under which former employees could share in commissions collected by Cushman & Wakefield subsequent to the termination of the employee's *1252 employment. It states in pertinent part:
(b) Employee shall not be entitled to share in any commissions or fees collected by C & W subsequent to the termination of Employee's employment, except under the following conditions:
(i) If any transaction has been finally consummated prior to the termination of Employee's employment but the commission or fee is not collected or due until after the termination:
... .
(iii) If a duly authorized written offer to lease specifying the essential terms of a lease agreement, including the rental rate, size and location of premises, length
of lease term, and concessions and special conditions required, has been made to a specifically identified landlord or tenant prior to the termination of Employee's employment, and thereafter within a period of three months, a lease substantially in accordance with and pursuant to such offer is consummated.
For the purpose of this Paragraph 9, ... a lease shall not be deemed consummated unless and until an agreement of lease has been fully and unconditionally executed and exchanged by and between the landlord and tenant. Employee's share of any commissions and fees collected by C & W subsequent to the termination of Employee's employment shall be subject to reduction by an amount to be determined by C & W if subsequent work or negotiations are necessary to conclude the transaction and C & W assigns other of its employees to handle same, to any commission or fee sharing arrangement made by Employee with any other C & W employees, and to all the other applicable terms and conditions of this Agreement. Except as specifically provided in this subparagraph (b), Employee shall not be entitled to any commissions, fees or other compensation whatsoever from C & W subsequent to the termination of Employee's employment... .
In 1982, appellees, as sales representatives of Cushman & Wakefield, negotiated a lease agreement between Golden Eagle Service Corporation, the lessee, and Cypress Center I Joint Venture, the lessor. The Wilson Management Company, a property management firm, represented the lessor in this transaction. The lease agreement was for a five-year term ending on September 30, 1987.
In addition to the lease agreement, Williams and Dombrova negotiated on behalf of Cushman & Wakefield a brokerage commission agreement which set forth the rates and circumstances under which Cushman & Wakefield would be entitled to the payment of a commission from the Wilson Company. The commission agreement provided for the payment of a four percent commission to Cushman & Wakefield based upon the aggregate rental amount for the entire term of the lease. In addition, the commission agreement provided for the payment of a possible future commission to Cushman & Wakefield if one of two possible scenarios occurred. First, Cushman & Wakefield was guaranteed a two percent commission on rentals generated by the tenant exercising an option or right contained in the original lease. Second, Cushman & Wakefield could be entitled to a commission if the tenant renewed or extended the lease or leased additional space and Cushman & Wakefield actively participated in this separate transaction. These two alternatives for possible future commissions read as follows:
[1] If the term of the lease is renewed or extended, or if the tenant leases any other additional space from the landlord, pursuant to an option or right contained in the original lease, in the original building, landlord shall pay additional commissions to C & W equal to two percent (2%) of the aggregate rental ... payable over the renewal or extension term or for such additional or other space.
[2] C & W shall not be entitled to commissions on renewals, extensions or leases of additional space that are not pursuant to options or rights contained in the original lease unless C & W actively participates in the negotiation of such a renewal, *1253 extension or lease of additional space.
Pursuant to the terms of the commission agreement, the Wilson Company paid Cushman & Wakefield a four percent commission based upon the total rental value over the lease term. This sum was thereafter divided with appellees under the terms of the standard schedule of compensation which was incorporated into the employment contracts.
Between March 1983 and December 1984, both appellees voluntarily resigned from employment with Cushman & Wakefield. Thereafter, neither appellee performed any services on behalf of Cushman & Wakefield in regard to the lease agreement.
In 1985, the tenant, Golden Eagle Service Corporation, assigned and transferred its rights under the lease agreement to its parent corporation, Investment Service for America Corporation. Thereafter, Investment Service continued to occupy the Cypress Center I premises and pay rent pursuant to the lease agreement terms as negotiated by Golden Eagle.
In early 1986, two other sales representatives employed by Cushman & Wakefield, John Fish and Jeffrey Feeley, contacted Investment Service representatives regarding the space at the Cypress Center. This inquiry was initiated at the request of another Cushman & Wakefield client who was interested in the Investment Service space. Subsequent to a meeting between the parties, Fish and Feeley wrote a letter to Investment Service, requesting that Investment Service appoint Cushman & Wakefield as the company's exclusive representative. Fish and Feeley offered to conduct a market analysis and solicit lease offers on behalf of Investment Service from other landlords in pursuit of either a relocation of Investment Service's corporate offices or a renegotiation of lease terms with the Wilson Company.
In February 1986, Investment Service appointed Cushman & Wakefield as Investment Service's sole broker and granted the company the exclusive right to obtain a lease or purchase of premises on Investment Service's behalf. The brokerage agreement further noted that unless otherwise agreed, Cushman & Wakefield would "look only" to the landlord or seller for a commission. In accordance with the exclusive brokerage agreement, Fish and Feeley explored the surrounding market for Investment Service. Desiring to keep Investment Service as a tenant, the Wilson Company chose to enter into negotiations with Cushman & Wakefield.
Thereafter, Investment Service and Fish and Feeley reached a different agreement as to a commission in the event Investment Service renegotiated a lease agreement with the Wilson Company. The commission was to be calculated as follows: Investment Service, without Cushman & Wakefield's assistance, was to contact the Wilson Company and request an offer as to lease terms for continued occupancy. Fish and Feeley then would take the terms of this offer and negotiate with the Wilson Company. If a lease agreement was entered into between Investment Service and the Wilson Company, Cushman & Wakefield would be compensated according to a percentage of savings obtained using the terms of Wilson's initial offer as the base. The amount of this contingent fee would be capped at an amount equal to four percent of the gross rent under the new transaction.
Following negotiations between Fish and Feeley and the Wilson Company, Investment Service sent the president of the Wilson Company, David Schaughency, a letter of intent which set forth the proposed terms and conditions of a lease commitment that would continue Investment Service's occupancy of the Cypress Center through September 30, 1992. Investment Service proposed that the lease commence effective July 1, 1986, with 4,633 additional square feet. Thereafter, the parties executed the document, converting it into a binding letter of intent.
The parties' letter of intent became a reality when Investment Service, as tenant, and Tampa-Cypress I, represented by the Wilson Company as landlord, entered into a "First Amendment to Lease Agreement."
*1254 The First Amendment to Lease was denominated as such because the parties had reached agreement upon the essential economic terms of a new lease but chose to retain the basic form and boilerplate language of the original.
The terms ultimately embodied in the amended lease differed from the terms of the original lease in the following respects:
1. A rental rate negotiated without reference to the original lease or its options.
2. The elimination of a letter of credit required by the original lease.
3. An additional 4,633 square feet of space was rented.
4. A construction allowance of $175,000 not available to the tenant under the original lease was included in the new transaction.
5. A new base year for cost calculation not present in the original lease.
6. Free rent concessions not available under the original lease.
7. Additional future space options.
Based upon the percentage of savings agreement, Investment Service paid Cushman & Wakefield a four percent commission for Cushman & Wakefield's services in negotiating with the Wilson Company. In addition, the Wilson Company paid Cushman & Wakefield a two percent commission under the earlier commission agreement with Cushman & Wakefield. Schaughency testified that Wilson paid Cushman & Wakefield a commission pursuant to the following provision: "C & W shall not be entitled to commissions on renewals, extensions or leases of additional space that are not pursuant to options or rights contained in the original lease unless C & W actively participates in the negotiation of such a renewal, extension or lease of additional space."
Appellees were paid no commission by Cushman & Wakefield for the negotiation and execution of the First Amendment to Lease. Cushman & Wakefield distributed the salesperson portion of the fee to Fish and Feeley.
Following a nonjury trial, the trial judge entered a final judgment in the amount of $29,637, which represented a full salesperson's share of the two percent commission paid by the Wilson Company plus prejudgment interest. The judgment also allowed costs and attorneys' fees, as provided for in the employment contract. We find the trial court erred in entering the final judgment in favor of the appellees.
The terms of this contract are unambiguous. The construction of the terms of an unambiguous contract is a question of law for the court. Peacock Constr. Co., Inc. v. Modern Air Conditioning, Inc., 353 So.2d 840 (Fla. 1977); Atkins v. Litsinger, 513 So.2d 178 (Fla. 2d DCA 1987); Reliance Ins. Co. v. Brickenkamp, 147 So.2d 200 (Fla. 2d DCA 1962). As such, this court is on an equal footing with the trial judge as an interpreter of the contract because that interpretation is based solely on the written document. See Dalton v. Dalton, 304 So.2d 511 (Fla. 4th DCA 1974). See also Florida Mining & Materials Corp. v. Standard Gypsum, 550 So.2d 47 (Fla. 2d DCA 1989).
The logical interpretation of the contract is that the appellees would be entitled to a commission only if the First Amendment to Lease was finally consummated prior to appellees' departure from the firm or possibly if the tenant exercised an option or right available in the original lease. The need to utilize current employees to work out available options would explain the provision that current employees of Cushman & Wakefield may be entitled to compensation from the commission otherwise due to the appellees. Here, however, the tenant never exercised its option to renew, but instead entered into a new lease with terms significantly different than the terms in original lease. Although the second lease was styled a "First Amendment to Lease Agreement" and included some language contained in the original lease, we find this second lease to be a new lease and that the appellees are not entitled to a commission. The final judgment is reversed, and this matter is remanded for the trial court to enter a final judgment in favor of Cushman & Wakefield.
*1255 Reversed and remanded for further proceedings consistent with this opinion.
LEHAN, A.C.J., and PATTERSON, J., concur.